**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IMC LENDING, LLC,<br><br>       *Plaintiff*,<br><br>       v.<br><br>1301 AVE J LLC, JOSEPH ZAFARANI, CHARLES ZAFARANI, ISAAC ZAFARANI, SHEVY'S CUSTOM WIGS, INC., AVE J Q WORKS, LLC, BAYA BAR AVENUE J LLC, SCHWEIGER DERMATOLOGY, PLLC, SUSHI TA'EEM CORP., NESHAMA DAYCARE, INC., BROOKLYN EYE SURGERY CENTER, LLC, KOCHMAN LEBOWITZ AND MOGIL, MDS, LLP, BHY CONTRACTOR, INC., ORBA ELECTRIC, INC., NEW YORK CITY DEPARTMENT OF FINANCE, NEW YORK CITY WATER BOARD, and JOHN DOES 1-10, the names of the "John Doe" defendants being fictitious and unknown to Plaintiff, the persons and firms intended being those who may be in possession of, or may have possessory, lien or other interests in, the premises herein described,<br><br>       *Defendants*. | Case No.: 1:22-cv-408<br><br><br>**COMPLAINT** |

Plaintiff IMC Lending, LLC ("**Lender**"), a Delaware limited liability company, by its attorneys, DLA Piper LLP (US), as and for its Complaint against the Defendants 1301 Ave J LLC ("**Borrower**"), Joseph Zafarani, Charles Zafarani, Isaac Zafarani, Shevy's Custom Wigs, Inc., Ave J Q Works, LLC, Baya Bar Avenue J LLC, Schweiger Dermatology, PLLC, Sushi Ta'eem Corp., Neshama Daycare, Inc., Brooklyn Eye Surgery Center, LLC, Kochman Lebowitz and

Mogil, MDS, LLP, BHY Contractor, Inc., ORBA Electric, Inc., New York City Department of Finance, New York City Water Board, and John Does 1–10, alleges as follows:

## **INTRODUCTION**

1.      This action is brought by Lender pursuant to Article 13 of the Real Property Actions and Proceedings Law to foreclose a Senior Mortgage and Junior Mortgage, as defined herein, securing a Senior Loan and Junior Loan in the original principal amounts of $12,400,000.00 and $250,000.00, respectively, made to Borrower, which have not been repaid in full.

2.      The property encumbered by the mortgages is a parcel of real property known as Block 6706, Lot 48 in the Borough of Brooklyn in the City of New York, and commonly known as 1301 Avenue J, Brooklyn, New York 11235, with appurtenances thereto and improvements thereon, all as more specifically described in **Schedule A** annexed hereto together (the "**Mortgaged Property**").  The Mortgaged Property is a two-story commercial building with seven (7) commercial units.

3.      In addition to seeking foreclosure of the Mortgaged Property, Lender seeks the appointment of a Temporary Receiver of the Rents and Profits, to protect Lender's security interest during the pendency of Lender's foreclosure action, deficiency judgments against the Borrower and Guarantors, as defined herein, and Lender's costs and fees associated with this litigation.

4.      1301 Ave J borrowed $12,400,000 from Lender in 2017, and another $250,000 in 2019, both secured by mortgages on the Mortgaged Property.  Lender agreed to amend the Loan Documents nine times, including during the height of the COVID-19 pandemic, to permit Borrower additional time to repay the amount due Lender under the Loan Documents, as defined herein.[1]

---

[1] "Loan Documents" collectively refer to the Senior Loan Documents and the Junior Loan Documents, as defined herein. *See infra* ¶ 66.

5.     Borrower failed to do so, and Lender served Borrower with notice of such default in May 2020.

6.     Since Borrower defaulted in May 2020, Borrower has repeatedly trampled on Lender's rights:

a.  Borrower refuses to provide information to the Lender that is required under the Loan Documents, including basic information on leases and the amount of rent collected.

b.  Borrower fails to seek or obtain Lender's consent to enter into leases or perform renovations at the Mortgaged Property, contrary to the express terms of the Loan Documents.

c.  Borrower has allowed mechanic's liens totaling more than $1,000,000 to be filed against the Mortgaged Property from contractors seeking payment for work allegedly performed for Borrower at the Mortgaged Property.

d.  Borrower undermined its contractual obligations pursuant to the parties' Assignment of Leases and Rents (as defined herein, "ALR") provided as security for the repayment of the loans by directing tenants to ignore communications from the Lender directing the Rent, as defined herein, to be paid directly to the Lender.

e.  Borrower also knowingly misled the tenants by falsely telling them that the ALR has no legal force or effect despite knowing that the Senior Loan had not been paid off and was still due and owing.

f.  Borrower refuses to make any debt service payment or other payments required under the Loan Documents.

g.  Borrower makes a bad faith claim seeking judicial enforcement of a non-existent agreement requiring Lender to accept a discounted payment of less than is due under the Loan in full satisfaction of the Borrower's obligations to Lender under the Loan Documents.  That the parties had no agreement in place is no obstacle to Borrower; rather, Borrower filed a lawsuit in the Supreme Court of New York, Kings County, which Lender has removed to this Court.

7.     Borrower remains in control of the Mortgaged Property, and its erratic behavior poses a considerable threat to Lender's interest in the Mortgaged Property as a secured creditor. Accordingly, Lender also seeks the immediate appointment of a receiver to protect the Mortgaged Property.

## THE PARTIES

8.      Lender is, and at all relevant times hereinafter mentioned was, a limited liability company organized and existing under the laws of Delaware, with an address at 2901 Butterfield Road, Oak Brook, Illinois 60523.

9.      Upon information and belief, Borrower is a limited liability company organized and existing under the laws of the State of New York, with an address at 3052 Brighton 1st Street, Suite M3, 4th Floor, Brooklyn, New York 11235, and is the owner of record of 1301 Avenue J, Brooklyn, New York 11235.

10.      Upon information and belief, Defendant Joseph Zafarani is a natural person who resides at 1517 Ocean Parkway, Brooklyn, New York 11230, and is the Guarantor under the Loan Documents, as hereinafter defined.

11.      Upon information and belief, Defendant Isaac I. Zafarani is a natural person who resides at 2184 Ocean Parkway, Brooklyn, New York 11223, and is the Guarantor of the Loan Documents.

12.      Upon information and belief, Defendant Charles H. Zafarani is a natural person who resides at 16 Bridle Dr., West Long Branch, New Jersey 07764, and is the Guarantor of the Loan Documents.  Joseph Zafarani, Isaac I. Zafarani, and Charles H. Zafarani are collectively referred to as "**Guarantors**" and each, individually, a "**Guarantor**."

13.      Upon information and belief, Defendant Shevy's Custom Wigs, Inc. ("**Shevy**"), a New York company registered in the State of New York, with a business address of 1884 Coney Island Avenue, Brooklyn, NY 11230, is a tenant at the Mortgaged Property.  Shevy is made a defendant in this action because, upon information and belief, Shevy has not executed a Subordination, Non-Disturbance, and Attornment Agreement ("**SNDA**") with Lender.

4

14.     Upon information and belief, Defendant Ave J Q Works, LLC ("**Q Works**"), a limited liability company registered in the State of New York with business addresses of 975A E 13th St., Brooklyn, NY 11230; and 395 Kingston Avenue, Brooklyn, NY 11225, is a tenant at the Mortgaged Property.  Q Works is made a defendant in this action because, upon information and belief, Q Works has not executed a SNDA with Lender.

15.     Upon information and belief, Defendant Baya Bar Avenue J, LLC ("**Baya Bar**"), a limited liability company registered in the State of New York with business addresses of 261 81st St, Brooklyn, NY 11209, is a tenant at the Mortgaged Property.  Baya Bar is made a defendant in this action because, upon information and belief, Baya Bar has not executed a SNDA with Lender.

16.     Upon information and belief, Defendant Schweiger Dermatology, PLLC ("**Schweiger**"), a professional limited liability company registered in the State of New York with business addresses of 156 W. 56th St., #1003, New York, NY 10019; and 27-01 Queens Plaza North, 10th Fl., Long Island City, NY 11101, is a tenant at the Mortgaged Property.  Schweiger is made a defendant in this action because, upon information and belief, Schweiger has not executed a SNDA with Lender.

17.     Upon information and belief, Defendant Sushi Ta'eem Corp. ("**Sushi Ta'eem**"), a corporation registered in the State of New York with a business address of 1307 Avenue J, Brooklyn, NY 11230, is a tenant at the Mortgaged Property.  Sushi Ta'eem is made a defendant in this action because, upon information and belief, Sushi Ta'eem has not executed a SNDA with Lender.

18.     Upon information and belief, Defendant Neshama Daycare, Inc. ("**Neshama**,"), a corporation registered in the State of New York with a business address of 2997 Ocean Parkway,

5

Brooklyn, NY 11235, is a tenant at the Mortgaged Property. Neshama is made a defendant in this action because, upon information and belief, Neshama has not executed a SNDA with Lender.

19.     Upon information and belief, Defendant Brooklyn Eye Surgery Center, L.L.C. ("**Eye Center**"), a limited liability company registered in the State of New York with a business address of 1301 Avenue J, 2nd Floor, Brooklyn, NY 11230, is a tenant at the Mortgaged Property. Eye Center is made a defendant in this action because, upon information and belief, Eye Center has not executed a SNDA with Lender.

20.     Upon information and belief, Defendant Kochman Lebowitz and Mogil, MDS, LLP ("**Kochman**" and together with Shevy, Q Works, Baya Bar, Sushi Ta'eem, Neshama, and Eye Center, the "**Tenant Defendants**"), a limited liability partnership registered in the State of New York with a business address of 1301 Avenue J, 2nd Floor, Brooklyn, NY 11230, is a tenant at the Mortgaged Property. Kochman is made a defendant in this action because, upon information and belief, Kochman has not executed a SNDA with Lender.

21.     Upon information and belief, Defendant BHY Contractor, Inc. ("**BHY**"), a corporation registered in the State of New York with a business address of 1206 Avenue J, Brooklyn, NY 11230, holds a mechanic's lien against the Mortgaged Property. BHY is made a defendant in this action because lienholders such as BHY are necessary parties to foreclosure actions under New York Law. *See* RPAPL § 1311(3).

22.     Upon information and belief, Defendant ORBA Electric, Inc. ("**ORBA**"), a corporation registered in the State of New York with a business address of 2030 Utica Avenue, Brooklyn, NY 11234, holds a mechanic's lien against the Mortgaged Property. ORBA is made a defendant in this action because lienholders such as ORBA are necessary parties to foreclosure actions under New York Law. *See* RPAPL § 1311(3).

23. Upon information and belief, Defendant New York City Department of Finance has a principal place of business located at 66 John St., 2nd Floor, New York, NY 10038, and is made a defendant in this action because it has or may have an interest in or lien against the Mortgaged Property by virtue of any unpaid New York City Real Estate Taxes that may be due and owing from the Borrower.

24. Upon information and belief, Defendant New York City Water Board has a principal place of business located at 59-17 Junction Boulevard, 8th Floor, Flushing, NY 11373, and is made a defendant in this action because it has or may have an interest in or lien against the Mortgaged Property by virtue of any unpaid New York City water bills that may be due and owing from the Borrower.

25. Upon information and belief, the "John Doe" defendants constitute those persons or corporations or firms that may be in possession of, or may have contract, possessory, lien or other interests in, the Mortgaged Property.

## JURISDICTION AND VENUE

26. Jurisdiction is proper under 28 U.S.C. § 1332.

27. Plaintiff is a corporation organized under the laws of the state of Delaware, with a principal place of business in Illinois. None of Lender's members are citizens of the state of New York. To the extent any member of Lender is an LLC, none of the members of such LLC is a citizen of the state of New York.

28. Defendants, on information and belief, are residents of, or domiciled in, New York.

29. The Court may exercise jurisdiction over Borrower, Q Works, Baya Bar, and Schweiger, and Eye Center because they are, on information and belief, limited liability companies duly organized and existing pursuant to the laws of the State of New York, duly qualified to do business in the State of New York, with a principal place of business in the State of New York.

7

30.     The Court may exercise jurisdiction over Shevy, Sushi Ta'eem, Neshama, Kochman, ORBA, and BHY because they are, on information and belief, companies duly organized and existing pursuant to the laws of the State of New York, duly qualified to do business in the State of New York, with principal places of business in the State of New York.

31.     The Court may exercise jurisdiction over the New York City Department of Finances, the New York State Department of Taxation, and the New York City Water Board because they are governmental entities of the State of New York or City of New York.

32.     The Court may exercise jurisdiction over Joseph Zafarani, Charles Zafarani, Isaac Zafarani, and John Does 1-10 because they are, on information and belief, New York citizens who have purposefully availed themselves of the laws of the State of New York.

33.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391, and C.P.L.R. §§ 507 and 509 because the judgement demanded in this action would affect title to, or the possession, use or enjoyment of real property situated in Kings County, which is situated in the Eastern District of New York.

## THE MORTGAGED PROPERTY

34.     The Mortgaged Property that is the subject of this action is known as Block 6706, Lot 48 in the Borough of Brooklyn in the City of New York and located at 1301 Avenue J, Brooklyn, New York 11235.

35.     The Mortgaged Property is improved with a two-story commercial building consisting of approximately 31,575 square feet of leasable space on Avenue J in Brooklyn's Midwood neighborhood, near schools, houses of worship, restaurants, banks, and other retailers. The Mortgaged Property is near the New York City Transit's Avenue J station, served by the B and Q subway trains, as well as several local and express bus lines.

36.     Upon information and belief, the Mortgaged Property includes seven commercial units.

## THE LOAN AND LIEN INSTRUMENTS

**A.     The Senior Loan**

37.     Upon information and belief, Borrower acquired the Mortgaged Property in 2016 as a tenant-in common and became the sole owner of the Mortgaged Property in 2017.

38.     On or about October 31, 2016, Borrower, as tenants in common with A. Monaco, LLC, and for the purpose of evidencing its indebtedness to W Financial Fund, LP, in the sum of $11,500,000.00, executed, and delivered to W Financial Fund, LP, a Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Filing as a first lien covering the Mortgaged Property (the "**Acquisition Mortgage**").  The Acquisition Mortgage was recorded on November 4, 2016 in the Register's Office as City Register File No. ("CRFN") 2016000390438, Document ID 2016110300107003.

39.     On or about January 27, 2017, the Borrower assumed A. Monaco, LLC's portion of the Acquisition Mortgage pursuant to the Assumption of Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Filing dated January 27, 2017 and recorded on February 6, 2017 in the Register's Office as CRFN 2017000051751, Document ID 2017020101622002.

40.     On or about October 31, 2017, W Financial Fund, LP assigned its interest in Acquisition Mortgage to Lender's predecessor through assignment, Inland Mortgage Lending, LLC ("**Inland**"), a Delaware limited liability company, pursuant to the Assignment of Mortgage, recorded on November 13, 2017 in the Register's Office as CRFN 2017000416360, Document ID 2017110600416003. At that time, Borrower indebtedness under the Acquisition Loan was $11,000,000.00.

9

41.    Contemporaneously, Borrower, for the purposes of evidencing additional indebtedness in the amount of $1,400,000.00 to Inland, executed, acknowledged, and delivered to Inland Mortgage Lending, LLC a Gap Mortgage dated October 31, 2017, and recorded on November 13, 2017 in the Register's Office as CRFN 2017000416361, Document ID 2017110600416004 (the "**Gap Mortgage**").

42.    On or about October 31, 2017, for value received, Inland and Borrower executed that certain Loan Agreement, dated October 31, 2017 (together with all amendments, the "**Senior Loan Agreement**").  Pursuant to the Senior Loan Agreement, Inland agreed to loan Borrower the total principal amount of $12,400,000.00, subject to the terms and conditions set forth therein (the "**Senior Loan**").  A true and correct copy of the Senior Loan Agreement is attached hereto as **Exhibit 1**.

43.    In connection with the Senior Loan Agreement, on or about October 31, 2017, for value received, Borrower executed and delivered the Amended, Restated and Consolidated Promissory Note ("**Senior Note**"), to evidence Borrower's indebtedness to Inland in the amount of $12,400,000.00.  A true and correct copy of the Senior Note is attached hereto as **Exhibit 2**.

44.    On or about October 31, 2017, the Acquisition Loan and the Gap Mortgage were consolidated to form a single lien payable to Inland in the sum of $12,400,000.00, executed, and delivered to Inland in an Amended, Restated and Consolidated Mortgage and Security Agreement dated October 31, 2017, and recorded on November 13, 2017 in the Register's Office as CRFN 2017000416362, Document ID 2017110600416005 (the "**Senior Mortgage**").  A true and correct copy of the Senior Mortgage is attached hereto as **Exhibit 3**.  The Senior Mortgage consolidated all prior liens on the property into one master mortgage.

45.     As additional security for payment of the Senior Loan, on or about October 31, 2017, Borrower executed and delivered to Inland that certain Assignment of Leases and Rents, dated October 31, 2017 ("**ALR**"), pursuant to which Borrower assigned to Inland its rights in, among other things, all Lease and Rents at the Mortgaged Property.[2]  This document was recorded on November 13, 2017 in the Register's Office as CRFN 2017000416363, Document ID 2017110600416006.  A true and correct copy of the ALR is attached hereto as **Exhibit 4**.

46.     As additional security for payment of the Loan, Borrower executed and delivered to Inland that certain Account Control and Cash Management Agreement, executed on or around November 10, 2017 ("**Cash Management Agreement**"), evidencing Borrower's agreement to establish a Lockbox or clearing account and pursuant to which Borrower granted Inland a continuing lien on and security interest in the Lockbox and the Accounts and all amounts from time to time on deposit therein.

47.     As additional security for payment of the Loan, Borrower executed and delivered that certain Conditional Assignment of Management Agreement, dated October 31, 2017 ("**AMA**"), through which Borrower agreed to assign all of Borrower's right, title and interest in

---

[2] As used herein, "Rent," is defined in Section 1.2(f) of the Senior Mortgage as "all right, title and interest of Borrower, its successors and assigns therein and thereunder, including, without limitation, cash or securities deposited thereunder to secure the performance by the lessees of their obligations thereunder and all rents, additional rents, rent equivalents, moneys payable as damages or in lieu of rent or rent equivalents, royalties (including, without limitation, all oil and gas or other mineral royalties and bonuses), income, receivables, receipts, revenues, deposits (including, without limitation, security, utility and other deposits), accounts, cash, issues, profits, charges for services rendered, and other consideration of whatever form or nature received by or paid to or for the account of or benefit of Borrower or its agents or employees from any and all sources arising from or attributable to the Property, including, all receivables, customer obligations, installment payment obligations and other obligations now existing or hereafter arising or created out of the sale, ground lease, lease, sublease, license, concession or other grant of the right of the use and occupancy of property or rendering of services by Borrower or Manager and proceeds, if any, from business interruption or other loss of income insurance whether paid or accruing before or after the filing by or against Borrower of any petition for relief under any Creditors Rights Laws."  A substantially similar definition appears at Section 1.1(c) of the ALR.

and to that certain Property Management Agreement, dated on or about October 31, 2017, and attached to the AMA.

48. As additional security for payment of the Senior Loan, Borrower executed and delivered that certain Environmental Indemnity Agreement, dated October 31, 2017 ("**Senior Environmental Indemnity**"), through which Borrower agreed to indemnify Inland from any Losses imposed by, *inter alia*, any liability arising from certain environmental contingencies at the Mortgaged Property.

49. Simultaneously with the recording of the Senior Mortgage and the ALR, Inland filed in the Register's Office a financing statement/fixture filing pursuant to the Uniform Commercial Code, further perfecting Lender's lien upon the fixtures and other tangible and intangible personal property related to and located at or within the Mortgaged Property pledged as security for the Loan pursuant to the terms of the Mortgage (the "**Fixture Filing**").  A true and correct copy of the Fixture Filing is attached hereto as **Exhibit 5**.

50. As additional security for payment of the Senior Loan, Joseph Zafarani, Charles Zafarani, and Isaac Zafarani executed and delivered to Inland, that certain Limited Recourse Guaranty, dated October 31, 2017 ("**Senior Guaranty**").  Pursuant to the Senior Guaranty, and as more particularly described below, Joseph Zafarani, Charles Zafarani, and Isaac Zafarani, each as a Guarantor, agreed, among other things, to repay the Senior Loan upon the occurrence of one or more Guaranteed Recourse Obligations of Borrower.  A true and correct copy of the Senior Guaranty is attached hereto as **Exhibit 6**.

**B.    The Parties Amend the Senior Loan Agreement**

51. On January 29, 2019, Lender's predecessor and Inland's successor-by-assignment, Inland MC Lending, LLC ("**Inland MC**") and Borrower amended the Senior Loan Agreement

through that Amendment to Loan Agreement and Omnibus Amendment to Other Loan Documents ("**Amendment**").  Pursuant to the Amendment, the outstanding principal balance of the Loan as of October 10, 2018, was $12,210,149.32.  Among other things, the Amendment adjusted the rate of interest under the Loan and made the debt fully recourse to Borrower.  A true and correct copy of the Amendment is attached hereto as **Exhibit 7**.

52.     Also on January 29, 2019, Inland MC and Guarantors amended the guaranty to a full recourse guaranty ("**Amended Guaranty**").  A true and correct copy of the Amended Guaranty is attached hereto as **Exhibit 8**.  The Amended Guaranty explicitly states: "Upon the occurrence and during the continuance of any Event of Default hereunder, the Guaranteed Obligations of Borrower, for purposes of this Guaranty, shall be deemed immediately due and payable at the election of Lender.  Guarantor shall, on demand, pay the Guaranteed Obligations of Borrower to Lender."  *Id*. § 2(b).  The term "Guaranteed Obligations of Borrower" means "all obligations and liabilities of Borrower for which Borrower shall be personally liable pursuant [to] the Loan Agreement, including but not limited to Article 13 thereof, as amended by that certain Amendment to Loan Agreement and Omnibus Amendment to Loan Documents dated January 29, 2019."  *Id.* § 1.  This guaranty was "unconditional[] and irrevocabl[e]," and "shall only be deemed discharged after the indefeasible satisfaction in full of the Guaranteed Obligations of Borrower and the Debt."  *Id* §§ 1, 7.

53.     On or about October 31, 2019, Inland MC and Borrower further amended the Senior Loan Agreement with the First Amendment to Loan Agreement, dated October 31, 2019 ("**First Amendment**"), and through which the parties agreed, among other things, to extend the Maturity Date of the Senior Loan to "the last calendar day of November 2019, or such other date on which

the final payment of the principal amount of the Loan becomes due and payable as herein provided, whether at such stated maturity date, by declaration of acceleration, or otherwise."

54.     On or about December 5, 2019, Inland MC and Borrower further amended the Loan Agreement with the Second Amendment to Loan Agreement and Omnibus Amendment to Other Loan Documents, dated December 5, 2019 ("**Second Amendment**").  Pursuant to the Second Amendment, Inland MC agreed, among other things, to further extend the Maturity Date of the Senior Loan to "the last calendar day of January 30, 2020, or such other date on which the final payment of the principal amount of the Loan becomes due and payable as herein provided, whether at such stated maturity date, by declaration of acceleration, or otherwise."

55.     On or about January 31, 2020, the parties executed a Third Amendment to Loan Agreement, dated January 31, 2020 ("**Third Amendment**"), in which Inland MC agreed, among other things, to further extend the Maturity Date of the Senior Loan to "the last calendar day of February, 2020, or such other date on which the final payment of the principal amount of the Loan becomes due and payable as herein provided, whether at such stated maturity date, by declaration of acceleration, or otherwise."

56.     On or about February 28, 2020, the parties executed a Fourth Amendment to Loan Agreement, dated February 28, 2020 ("**Fourth Amendment**"), in which Inland MC agreed, among other things, to further extend the Maturity Date of the Senior Loan to "the last calendar day of March, 2020, or such other date on which the final payment of the principal amount of the Loan becomes due and payable as herein provided, whether at such stated maturity date, by declaration of acceleration, or otherwise."

57.     On or about March 31, 2020, the parties executed a Fifth Amendment to Loan Agreement, dated March 31, 2020 ("**Fifth Amendment**"), in which Inland MC agreed, among

14

other things, to further extend the Maturity Date of the Senior Loan to "May 10, 2020, or such other date on which the final payment of the principal amount of the Loan becomes due and payable as herein provided, whether at such stated maturity date, by declaration of acceleration, or otherwise." A true and correct copy of the Fifth Amendment is attached hereto as **Exhibit 9**.

58.     The Senior Loan Agreement, Senior Note, Senior Mortgage, ALR, Cash Management Agreement, AMA, Senior Environmental Indemnity, Fixture Filing, Senior Guaranty, Amendment, First Amendment, Second Amendment, Third Amendment, Fourth Amendment, and Fifth Amendment are referred to collectively as the "**Senior Loan Documents**."

**C.      Inland MC Loans Borrower an Additional $250,000.00 with the Junior Loan**

59.     On or about December 4, 2019, Inland MC agreed to provide a new loan in the principal amount of $250,000 (the "**Junior Loan**"). On or about December 5, 2019, for value received, Borrower executed and delivered the Mortgage Note, dated December 5, 2019, in the principal amount of $250,000.00 ("**Junior Note**"). A true and correct copy of the Junior Note is attached hereto as **Exhibit 10**.

60.     As security for the payment of the indebtedness evidenced by the Junior Note, Borrower executed and delivered to Inland MC that certain Mortgage, dated December 4, 2019 ("**Junior Mortgage**"). The Junior Mortgage granted Inland MC a second-priority lien and security interest in the Mortgage Property, and was recorded on December 13, 2019, in the Register's Office as CRFN 2019000407701. A true and correct copy of the Junior Mortgage is attached hereto as **Exhibit 11**.

61.     As additional security for the Junior Loan, on or about December 5, 2019 the parties executed an Environmental Indemnity Agreement, dated December 5, 2019 ("**Junior Environmental Indemnity**"), through which Borrower agreed to indemnify Inland MC from any

Losses imposed by, *inter alia*, any liability arising from certain environmental contingencies at the Mortgaged Property.

62.     As additional security for payment of the Junior Loan Agreement, Joseph Zafarani, Charles Zafarani, and Isaac Zafarani executed and delivered to Inland MC, that certain Limited Recourse Guaranty, dated December 5, 2019 ("**Junior Loan Guaranty**").  Pursuant to the Junior Loan Guaranty, and as more particularly described below, Joseph Zafarani, Charles Zafarani, and Isaac Zafarani, each as a Guarantor, agreed, among other things, to repay the Junior Loan upon the occurrence of one or more Guaranteed Recourse Obligations of Borrower, defined in Exhibit A to the Junior Loan Guaranty, and stated below.  A true and correct copy of the Junior Loan Guaranty is attached hereto as **Exhibit 12**.

63.     On or about January 31, 2020, the parties executed an Omnibus Amendment to Loan Documents, dated January 31, 2020 ("**First Amendment to Junior Loan Documents**"), which, among other things, extended the computation and payment section of the Junior Note by one month to the last calendar day of February 2020, and simultaneously extended all payment dates under the Junior Loan Documents.

64.     On or about February 28, 2020, the parties executed an Omnibus Amendment to Loan Documents, dated February 28, 2020 ("**Second Amendment to Junior Loan Documents**"), which, among other things, extended the computation and payment section of the Junior Note by one month to the last calendar day of March 2020, and simultaneously extended all payment dates under the Junior Loan Documents.

65.     On or about March 31, 2020, the parties executed a third Omnibus Amendment to Loan Documents, dated March 31, 2020 ("**Third Amendment to Junior Loan Agreement**"), which, among other things, extended the computation and payment section of the Junior Note to

16

May 10, 2020, and simultaneously extended all payment dates under the Junior Loan Documents. A true and correct copy of the Third Amendment to Junior Loan Documents is attached as **Exhibit 13**.

66.     The Junior Note, Junior Mortgage, Junior Environmental Indemnity, Junior Guaranty, First Amendment to Junior Loan Documents, Second Amendment to Junior Loan Documents, and Third Amendment to Junior Loan Documents are referred to collectively as the "**Junior Loan Documents**," and together with the Senior Loan Documents, the "**Loan Documents**."

**D.     Lender Possesses the Loan Documents**

67.     On or around June 6, 2018, Inland assigned the Senior Note to Inland MC, as evidenced by that certain Allonge to Amended, Restated and Consolidated Promissory Note, dated on or around June 6, 2018 ("**Allonge**"). A true and correct copy of the Allonge is attached hereto as **Exhibit 14**.

68.     On or around August 5, 2020, Inland assigned its interest in the Senior Mortgage to Inland MC through an Assignment of Amended, Restated and Consolidated Mortgage and Security Instrument ("**Assignment of Senior Mortgage**"). The Assignment of Senior Mortgage was recorded in the Register's Office on October 7, 2020 as CFRN 2020000273804, Document ID: 2020092401136001. A true and correct copy of the Assignment of Senior Mortgage is attached hereto as **Exhibit 15**.

69.     On or around August 5, 2020, Inland assigned its interest in the ALR to Inland MC through an Assignment of Assignment of Leases and Rents, dated August 5, 2020 ("**Assignment of ALR**"), and recorded in the Register's Office on August 21, 2020 as CFRN 2020000236000,

17

Document ID 2020080700426001.  A true and correct copy of the Assignment of ALR is attached hereto as **Exhibit 16**.

70.    On or around December 30, 2020, Inland MC assigned the Senior Note and Junior Note to Lender, as evidenced by that certain Allonge to Amended, Restated and Consolidated Promissory Note, and Allonge to Mortgage Note, respectively.  Simultaneously therewith, Inland MC assigned its interest in the Junior Mortgage, Senior Mortgage, and ALR to Lender through three separate assignments.  True and correct copies of the allonge to the Senior Note and Junior Note, as well as the assignment of the Senior Mortgage, Junior Mortgage and ALR to Lender are attached hereto as **Exhibits 17, 18, 19, 20, 21**, respectively.

## BORROWER DEFAULTS

**A.    The Monetary Default**

71.    On or around May 10, 2020, Borrower failed to pay the outstanding principal balance and accrued interest and other charges, including but not limited to the Loan Maintenance Fee, under the Loan Documents, when the Senior Loan and Junior Loan were due.

72.    On May 21, 2020, Inland MC notified Borrower, by letter dated of same date ("**Default Notice**"), that $13,131,892.39 was due under the Senior Note, and $96,642.35 was due under the Junior Note, and "as a result of Borrower's failure to pay such payments by May 10, 2020, an Event of Default now exists under the Senior Loan and Junior Loan, respectively."  A true and correct copy of the Default Notice is attached hereto as **Exhibit 22**.

73.    Inland MC also advised that "[a]s a result of the incurrence of this Event of Default, the interest rate on the Senior Loan and Junior Loan will be increased to the Default Rate."  *Id.*

74.    In the Default Notice, Inland MC specifically advised that the defaults identified are "not intended to be an exhaustive list of each failure of Borrower and/or Guarantors to comply with the respective obligations of Borrower and Guarantors under the Loan Documents."

**B.      Borrower's Continued Breaches and Defaults Under the Loan Documents**

75.    Since Borrower first defaulted under the Loan Documents in May 2020, Borrower has repeatedly ignored the terms of the Loan Documents.  Borrower's actions have resulted in additional breaches of and defaults under the Loan Documents.

76.    Borrower has refused to provide Lender with all the Rents obtained from the Mortgaged Property despite the Lender's revocation of the ALR.

77.    Lender revoked the Borrower's license to collect Rents in the ALR.  Section 3.1 of the ALR states that, upon an Event of Default, Lender is "immediately [] entitled to possession of all Rents and sums due under any Lease Guaranties, whether or not Lender enters upon or takes control of the [Mortgaged] Property."

78.    In other words, any Rents collected from the Mortgaged Property since the Event of Default must be provided to the Lender, and Lender is entitled to an order directing all Rents and sums due under any leases in accordance with the terms of the Loan Documents.

79.    On or around June 1, 2020, and again on September 1, 2020, Inland Mortgage Capital, LLC directed tenants at the Mortgaged Property to submit payments directly to Lender.

80.    Upon information and belief, Borrower directed tenants to ignore the communications, and instructed tenants at the Mortgaged Property to submit Rents directly to the Borrower, and contrary to the Lender's rights in the ALR.

81.    Borrower eventually relented and, on or around November 12, 2020, Borrower and Inland Mortgage Capital, LLC sent a joint letter to tenants directing Rents be sent to "1301 Ave J, LLC, 2901 Butterfield Road, Oak Brook, Illinois 60523."  The letter was signed by Borrower's and Lender's principals.

82. Borrower soon relapsed, however. Borrower refused to provide information regarding the state of the Mortgaged Property, including an accounting of Rents both paid and due.

83. In addition, and contrary to the Loan Documents, Borrower has failed, despite repeated requests, to provide information concerning the leases being entered into at the Mortgaged Property, or to provide any regular financial reports on the status of the Property. *See* **Exhibit 1**, Senior Loan Agreement, § 4.14.

84. Upon information and belief, since Borrower's May 2020 default, several new tenants have leased space in the Mortgaged Property, including Baya Bar, Neshama, and Sushi Ta'eem. Lender was not provided with any of the leases for these tenants prior to their occupancy, as the Loan Documents require. *See* **Exhibit 1**, Senior Loan Agreement, § 4.14.

85. On or around December 7, 2020, Borrower sued its tenant Kochman due to Kochman's alleged failure to pay rent to the Landlord beginning in April 2020 at the start of the COVID-19 pandemic and resulting government shutdown orders.

86. By May 2021, a year after defaulting on the mortgage, rent proceeds continued to be late, and when they arrived, most submissions had gone first through the Borrower rather than directly to the Lender as the parties stated in their joint letter. Lender also had no way of telling whether all the rent submitted was all rent being collected.

87. On May 5, 2021, Lender sent a letter to Borrower explaining that "Borrower continues to collect Rent from tenants at the [Mortgaged] Property," and "Borrower must direct all tenants to pay all Rent directly to Lender, or immediately implement a lockbox under Lender's control to ensure Lender obtains all Rent."

88. Lender also requested an "updated rent roll detailing the building's current tenants, their respective monthly rents, and their payments to date," and informed Borrower that he "has

failed to provide leases for Lender's approval, as required by the Loan Documents," and that all judgments or settlements from any litigation with tenants "inures to Lender's benefit."

89.   Lender specifically noted the landlord-tenant litigation with Kochman and explained that any judgment or settlement should accrue to the Lender, not Borrower, pursuant to the ALR.

90.   Following this letter, Borrower still refused to provide an accounting of the Rent or disclose whether Rent was being sent to Lender in accordance with the ALR.   The minimum information that was provided showed that only three of the tenants were paying rent: Schweiger in the amount of $18,571.14 per month, Shevy in the amount of $10,000 per month, and Baya Bar in the amount of $5,000 per month.   In addition, new tenants were occupying the Mortgaged Property, even though Borrower had not provided any leases for Lender to review, including Neshama and Sushi Ta'eem.

91.   On June 29, 2021, Lender sent letters directly to tenants demanding Rent be remitted directly to Lender, as was Lender's right.   Lender enclosed a copy of the Default Notice and the ALR itself.

92.   In response, Borrower directed tenants to "ignore" the Lender's letter and to continue to submit Rent to the Lender.   Unbeknownst to the tenants, however, and upon information and belief, Borrower kept the Rent for himself instead of submitting it to the Lender, as it previously had done.

93.   Upon information and belief, Borrower settled its dispute with its tenant Kochman, and has collected Rents from Kochman in settlement of the case.   Borrower has not submitted these Rents to the Lender despite its obligation to do so under the ALR, and Lender's direction in

21

its May 5 letter.  To the extent one exists, Lender has not received a copy of the settlement agreement between Borrower and Kochman.

94.    On August 2, 2021, Borrower took the extraordinary step of sending tenants a letter that "reject[ed]" Lender's June 29 letter, claiming it is "unsupported by law and fact" ("**Borrower's Erroneous Tenant Letter**").  In support of this erroneous statement, Borrower's identified a purported "termination" of ALR filed by The Huntington National Bank ("**Huntington**") on January 11, 2021.

95.    Despite making such an erroneous statement to the tenants, Borrower was seeking to satisfy the mortgage at that same moment, and made representations in signed affidavits to the Supreme Court of New York, Kings County, that the mortgage was in effect.

96.    The purported "termination" of ALR and a related "satisfaction of mortgage" refer to an electronic Discharge of Mortgage (the "**Illegitimate Mortgage Discharge**"), and a Termination of Assignment of Rents  ("**Illegitimate ALR Termination**," and together with the Illegitimate Mortgage Discharge, the "**Illegitimate Documents**") made and recorded with the Office of the Register of the City of New York on  January 15, 2021 ("**Register's Office**") by First American Title Insurance Company allegedly as the authorized representative of Huntington.  The Discharge of Mortgage purported to discharge the Senior Mortgage and the Termination of Assignment of Rents purported to terminate the ALR without Lender's knowledge or consent.  True and correct copies of the Illegitimate Documents are attached as **Exhibits 23** and **24**.

97.    At the time of the recording of the Illegitimate Documents, Huntington had no interest in the Senior Mortgage, the ALR, or the Property.  Huntington has acknowledged the same in an affidavit ("**Huntington Affidavit**") stating that (i) "Huntington lacked the authority to execute the 1301 Avenue J Mortgage Satisfaction and 1301 Avenue J ALR Satisfaction;" (ii) that

"Huntington did not . . . intend to release the [Senior Mortgage] or [ALR];" and (iii) "Huntington inadvertently and erroneously executed the 1301 Avenue J Mortgage Satisfaction and 1301 Avenue J ALR Satisfaction."  A true and correct copy of the affidavit from Huntington is attached as **Exhibit 25.**

98.   On August 18, 2021, and October 6, 2021, Lender's counsel sent Borrower's counsel letters regarding Borrower's Erroneous Tenant Letter, and enclosed a copy of the Huntington Affidavit with the October 6 correspondence.

99.   Nonetheless, Borrower has refused to accept Huntington's position, and has, upon information and belief, chosen to instead leverage Huntington's error, not at all due to any act or omission of Lender and with full knowledge that the Senior Loan had not been paid in full allowing for such discharge of the Senior Mortgage and termination of the ALR, as justification for its failure to perform its obligations under the Loan Documents and to misrepresent the actual facts to gain advantage and convert Rent due to Lender.  Borrower's actions constitute yet another breach of the Loan Documents.  *See* **Exhibit 1**, § 4.9.

100.   Huntington has commenced a Special Proceeding in New York State Supreme Court, Kings County seeking to expunge the Illegitimate Documents from the records of the Register's Office.  *See Huntington National Bank v. Inland Mortgage Lending LLC, et al.*, Case No. 527268/2021 (Sup. Ct. Kings Cty. 2021) (the "**Special Proceeding**").  Upon information and belief, Borrower, again in an attempt to benefit from Huntington's error, has filed a Motion to Dismiss the action instead of accepting Huntington's representations and to comply with its obligation under the Loan Documents to take action to preserve the security interest of the Lender in the unpaid and outstanding Senior Loan.

23

101.    Upon information and belief, Borrower continues to collect Rent from the tenants and has not retracted or rescinded its representations to the tenants regarding the termination of the ALR.  Based on the rental income last provided in May 2021, Borrower is likely collecting *at least* $33,571,14 per month in total from Schweiger, Shevy and Baya Bar.  The actual collection is likely much higher, however, since Neshama occupies a prominent space in the Mortgaged Property, the litigation with Kochman has been resolved, and Sushi Ta'eem has opened.  Upon information and belief, Borrower is holding all Rents for itself.

102.    In addition to Borrower's failure to remit Rent or settlement proceeds, Borrower has engaged in substantial renovations at the Mortgaged Property without first seeking Lender's consent as required under the Loan Documents.  *See* **Exhibit 1**, Senior Loan Agreement, § 4.14.

103.    Borrower's failure to pay for services provided has resulted in five mechanics liens recorded against title to the Mortgaged Property: four filed by ORBA in the amount of $138,447.63, $161,482.33, $53,522.39 and $63,722.30, and another filed by BHY in the amount of $763,770.34.  The liens, filed on July 7, 2021, total over $1.18 million.  True and correct copies of the liens filed by ORBA and BHY are attached as **Exhibit 26**.

104.    Finally, Borrower's erratic behavior is also evidenced by its behavior in this Court. Borrower initiated a baseless case against the Lender seeking to enforce a non-existent agreement for a reduced payoff of the loan for $13,000,000, subject to an indefinite extension.  Lender then removed the case to this Court, and the Honorable William F. Kuntz granted Lender's request to file a motion to dismiss and a motion for a receiver.  Borrower then voluntarily dismissed its case on the eve of Lender filing its receiver motion, only to again re-file, which prompted Lender to again remove the case to this Court.

105.    In all events, Borrower's assertion is not correct.  Lender never agreed to amend the Loan Documents to accept a reduced payoff, and as noted above, every one of the **nine** amendments to the Loan Documents were documented in writing, as well as a November 2020 payoff agreement that expired by its own terms in December 2020.  The written modifications were all consistent with the terms of the Loan Documents, which require any modification to be in writing.

106.    On January 14, 2022, Lender sent a supplemental default notice ("**Supplemental Default Notice**") reminding Borrower that the Senior Loan and Junior Loan are in default, and identifying additional breaches of the Loan Documents as a consequence of the aforementioned facts, stating the total amount now outstanding and including a Payoff Statement.  A true and complete copy of the Supplemental Default Notice, with Payoff Statement attached, is attached as **Exhibit 27**.

107.    As stated in the Supplemental Default Notice, as of January 14, 2022, the total outstanding amount due under the Loan Documents is $15,640,249.21, excluding accrued and unpaid legal fees.

108.    As stated in the Supplemental Default Notice, and upon information and belief, Borrower has also breached the terms of the Loan Documents, and defaulted under the terms of the Loan Documents by, *inter alia*, engaging in the following actions:

a) Collecting rent from tenants and refusing to remit it to Lender following an Event of Default under the Loan Documents, in violation of Section 3.1 of the ALR;

b) Amassing $1.18 million in mechanic's liens—four filed by ORBA and another filed by BHY—contrary to Section 4.16(a) of the Senior Loan Agreement;

c) Failing to provide a complete accounting of the Rents received, including amounts received from the settlement in the litigation captioned *1301 Ave J LLC v. Kochman Lebowitz & Mogil, MDS, LLP, et al*., Index No. 524308/2020 (Sup. Ct., Kings Cty.), and an Annual Operating Budget and Annual Capital Budget, in violation of Section 4.12 of the Senior Loan Agreement;

25

d) Failing to provide leases for several new tenants that appear to occupy the Mortgaged Property for Lender's approval, including Baya Bar, Neshama, and Sushi Ta'eem, in violation of Section 4.14 of the Senior Loan Agreement;

e) Refusing to take action or cooperate with Lender concerning the Special Proceeding, and, instead, frustrating Lender's rights under the Loan Documents, contrary to Section 4.9 of the Senior Loan Agreement; and

f) Failing to obtain Lender's prior approval "in connection with any alterations to any Improvements . . . that are structural in nature" or whose costs "exceed the Alteration Threshold", as evinced by Borrower amassing over $1 million in mechanic's liens. The Alteration Threshold is 5% of the outstanding principal balance, which is $624,744.06. Thus, given that the lien amounts far exceed the Alteration Threshold, and are likely structural in nature, Borrower has violated Section 4.21 of the Loan Documents.

109. The aforementioned actions constitute breaches of, or Events of Default under, the Loan Documents.

110. Pursuant to Section 10.2(a) of the Senior Loan Agreement, upon the occurrence and during the continuance of an Event of Default:

> Lender may . . . take such action, without such notice or demand, that Lender deems advisable to protect and enforce its rights against Borrower and in the Property, including without limitation, declaring the Debt to be immediately due and payable, and Lender may enforce or avail itself of any or all rights or remedies provided in this Agreement, the Security Instrument, the Note and the other Loan Documents against Borrower and the Property, including, without limitation, all rights or remedies available at law or in equity.

## LENDER'S RIGHT TO FORECLOSE

111. The Loan Documents were delivered to Lender in due course.

112. Pursuant to Article 2 of the Senior Note, the "Debt shall without notice become immediately due and payable at the option of Lender if any payment required in this Note is not paid on or prior to the date when due or if not paid on the Maturity Date or upon the occurrence and during the continuance of any other Event of Default."

113.    The Junior Note similarly states that "[i]n the event of any default in the terms, covenants, conditions, provisions and agreements of the [Junior] Mortgage or of this [Junior] Note . . . the entire principal sum and accrued interest thereon shall become due and payable at the option of the holder hereof."

114.    The Senior Loan Documents granted Lender a first priority security interest in the Mortgaged Property, as well as fixtures and personal property associated with the Mortgaged Property.

115.    The Junior Loan Documents granted Lender a second priority security interest in the Mortgaged Property, as well as fixtures and personal property associated with the Mortgaged Property.

116.    Lender is the owner and holder of the Loan Documents and is authorized to exercise all of its rights with respect to the Loan Documents.

117.    Lender's collateral assignment to Huntington was fully repaid and closed on or around June 7, 2018, and the Release was filed on or around April 1, 2021.  Lender remained the owner of the Senior Mortgage and ALR as the assignment was for collateral purposes.

118.    When the Illegitimate Documents were filed, Huntington had no interest in the Senior Mortgage and the ALR, and the Illegitimate Documents were and are void at their inception.

119.    Section 8.1(b) of the Senior Mortgage provides that upon the occurrence and during the continuance of any Event of Default, Lender may "institute proceedings, judicial or otherwise, for the complete foreclosure of this [Senior Mortgage] under any applicable provision of law, in which case the Property or any interest therein may be sold for cash or upon credit in one or more parcels or in several interests or portions and in any order or manner[.]"

120. Section 10.2(f) of the Senior Loan Agreement similarly provides that upon the occurrence and during the continuance of an Event of Default,

> Lender is authorized to . . . bring any action or proceeding to protect its interest in the Property for such purposes, and the actual out-of-pocket cost and expense thereof (including reasonable attorneys' fees to the extent permitted by applicable law), with interest as provided in this Section, shall constitute a portion of the Debt and shall be due and payable to Lender upon demand.  All such actual out-of-pocket costs and expenses incurred by Lender in remedying such Event of Default or such failed payment or act or in appearing in, defending, or bringing any action or proceeding shall bear interest at the Default Rate, for the period after such cost or expense was incurred into the date of payment to Lender.  All such costs and expenses incurred by Lender together with interest thereon calculated at the Default Rate shall be deemed to constitute a portion of the Debt and be secured by the liens, claims and security interests provided to Lender under the Loan Documents and shall be immediately due and payable upon demand by Lender therefor.

121. Lender has elected to declare immediately due and payable the entire unpaid balance of principal under the Senior Loan and Junior Loan, together with monies advanced for taxes, insurance, property management, as well as the costs, allowances, and reasonable attorney's fees to the extent permitted by the Judgment.

## LENDER'S RIGHT TO APPOINTMENT OF AN *EX PARTE* RECEIVER

122. Among Lender's rights and remedies upon the occurrence of an Event of Default is to have a receiver appointed, without notice and without regard for the adequacy of the security of the Senior Mortgage.

123. Section 8.1(g) of the Senior Mortgage provides that upon the occurrence and during the continuance of any Event of Default, Lender may "seek and obtain the appointment of a receiver, trustee, liquidator or conservator of the Property, without notice and without regard for the adequacy of the security for the Debt and without regard for the solvency of Borrower, any guarantor or indemnitor under the Loan or any other Person liable for the payment of the Debt."

28

124. Section 3.1 of the ALR explains that, upon an Event of Default, Lender is "immediately [] entitled to possession of all Rents and sums due under any Lease Guaranties, whether or not Lender enters upon or takes control of the Property." In other words, any Rent collected from the Property since the Event of Default must be provided to the Lender.

125. In other words, any Rent collected from the Property since the Event of Default must be provided to the Lender, and Lender is entitled to an order directing all Rents and sums due under any Guaranties in accordance with the terms of the Loan Documents.

126. The Lender may thereupon "enter into or upon the Property, either personally or by its agents, nominees or attorneys and dispossess Borrower and its agents and servants therefrom . . . and take possession of all books, records and accounts relating thereto and Borrower agrees to surrender possession of the Property and of such books, records and accounts to Lender upon demand."

127. Likewise, Section 5 of the Junior Mortgage provides that "the holder of this mortgage, in any action to foreclose it, shall be entitled to the appointment of a receiver."

## THE GUARANTIES

128. In order to induce Lender to enter into the Loan Agreement and other loan documents, and as additional security for the Loan, Joseph Zafarani, Charles Zafarani, and Isaac Zafarani, each executed and delivered the Senior Guaranty, as amended by the Amended Guaranty, and Junior Guaranty to Lender.

129. The Senior Guaranty, as amended by the Amended Guaranty, provides that, on "the occurrence and during the continuance of any Event of Default hereunder, the Guaranteed Obligations of Borrower, for purposes of this Guaranty, shall be deemed immediately due and payable at the election of Lender. Guarantor shall, on demand, pay the Guaranteed Obligations of Borrower to Lender." **Exhibit 8**, at § 2(b).

130. The term "Guaranteed Obligations of Borrower" means "all obligations and liabilities of Borrower for which Borrower shall be personally liable pursuant [to] the Loan Agreement, including but not limited to Article 13 thereof, as amended by that certain Amendment to Loan Agreement and Omnibus Amendment to Loan Documents dated January 29, 2019," *i.e.*, the Amendment. **Exhibit 8**, at § 1.

131. In turn, Article 13, as amended, states that the Debt is fully recourse to Borrower. *See* **Exhibit 7**, at § 1(f) ("The Debt shall be fully recourse to Borrower.").

132. Thus, the Borrower and Guarantors agreed to pay the full amount due on the loan in the event of an Event of Default.

133. Under the Junior Guaranty, Guaranteed Recourse Obligations of Borrower is defined in Exhibit A to the Junior Guaranty.

134. Per Exhibit A to the Junior Guaranty, Borrower may be personally liable for any Loss arising out of or in connection with certain defined "bad boy acts," including, *inter alia*:

> (vi) the misapplication, misappropriation or conversion by any Borrower Party of . . . (C) any rents during the continuance of an Event of Default, . . . (xi) any unauthorized entering into, modification, settlement or termination of any Lease at the Property in violation of any of the Existing Loan Documents; . . . (xiii) Borrower's failure after and during the continuation of an Event of Default to deliver on demand by Lender all rents and records (in Borrower's possession) relating to the Property and any act or omission by the Borrower or any Guarantor or any of their affiliates which hinders, delays or interferes with Lender's enforcement of the lockbox established by the Restricted Account Agreement . . . executed and delivered in connection with the Existing Loan; . . . .

135. Furthermore, Guarantors may be personally liable for the full amount of the Debt in the event that Borrower engages in:

> (ii) fraud or intentional misrepresentation by any Borrower Party in connection with the Loan, (iii) any act or omission of any of Borrower or any Guarantor or affiliate of any thereof which hinders, delays or interferes with Lender's enforcement of its rights

30

hereunder or under any other Loan Document or the realization of the collateral, including the assertion by any of Borrower or any Guarantor of defenses or counterclaims unless Borrower or any Guarantor, as the case may be, is the prevailing party in the action in which such defense or counterclaim is asserted . . . .

136.    Upon information and belief, Borrower has engaged in so-called "bad boy acts," including the misapplication, misappropriation or conversion of Rents during the continuance of an Event of Default, unauthorized entering into, modification, settlement or termination of any Lease at the Mortgaged Property, and/or Borrower's failure after and during the continuation of an Event of Default to deliver on demand by Lender all rents and records relating to the Mortgaged Property.

137.    Upon information and belief, Borrower and/or Guarantors have engaged in "fraud or intentional misrepresentations" in connection with the Loan, has engaged in "acts or omissions" that "hinders, delays or interferes with Lender's enforcement of its rights hereunder or under any other Loan Document or the realization of the collateral," or both.

138.    Pursuant to Section 1 of both the Senior Guaranty and Junior Guaranty, each Guarantor "unconditionally and irrevocably guarantees to Lender the punctual payment when due, and not merely the collectability, whether by lapse of time, by acceleration of maturity, or otherwise, and at all times thereafter the payment of the Guaranteed Recourse Obligations of Borrower."

139.    Each of the Guarantors are named as a defendant herein to preserve Lender's rights to recover from each of the Guarantors any deficiencies Lender incurs in the foreclosure action that remain unpaid after receipt of the proceeds of the foreclosure sale.

## NO WAIVER OF OTHER REMEDIES

140.    No other action or proceeding has been commenced at law or otherwise for the recovery of the sums secured by the Mortgaged Property or any part thereof.

141.    Lender does not waive their right to amend the Complaint in this action or to take such other action as may be appropriate pursuant to the Loan Documents.

142.    Lender has complied with all state and federal statutes, Executive Orders, Administrative Orders, Acts and directives instituted as a result of the COVID-19 pandemic.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Foreclosure of Senior Mortgage)

143.    Lender repeats and realleges the allegations contained in paragraphs 1 through 142 as though fully set forth herein.

144.    Lender is the owner and holder of the Loan Documents, including the Senior Mortgage, and is authorized to commence a foreclosure action pursuant to the Loan Documents.

145.    For the avoidance of doubt, the Illegitimate Documents, including the Illegitimate Mortgage Discharge, is void and was void at its inception because Huntington had no authority to file the Illegitimate Documents, no interest in the Senior Mortgage when filed, and Huntington acknowledges the Illegitimate Documents were filed in error.

146.    Borrower's inability or unwillingness to pay the required sums required under the Loan Documents constitutes grounds for foreclosure of the Mortgaged Property under the Loan Documents, including the Senior Mortgage.

147.    Accordingly, Lender demands Judgment that Borrower, Guarantors, and the other defendants, and any and all persons claiming under said defendants, subsequent to the commencement of this action and filing of the notice of pendency thereof, be forever barred and foreclosed of and from all estate, right, claim, lien and equity of redemption of, in and to the said

Mortgaged Property, and each and every part thereof, including any personal property appurtenant thereto, and that the Mortgaged Property be sold according to law; that the money arising from the sale be brought into Court; that the Lender be paid the amount under the Loan Documents, including the Senior Mortgage, Junior Mortgage, Senior Note and Junior Note, with the accrued interest and late charges thereon to the time of such payment, in accordance with the Loan Documents, together with its reasonable attorneys' fees, court costs, other expenses and disbursements of this action, and the expenses of said sale.

**AS AND FOR A SECOND CAUSE OF ACTION**
**(In The Alternative - Foreclosure of Equitable Lien)**

148.    Lender repeats and realleges the allegations contained in paragraphs 1 through 147 as though fully set forth herein.

149.    The debt evidenced by the Senior Note and Senior Loan Agreement has not been repaid.

150.    The Illegitimate Mortgage Discharge did not extinguish or satisfy Lender's security interest, evidenced by the Senior Note and Senior Loan Agreement and other Loan Documents, but rather gave Lender an unrecorded equitable lien on the Mortgaged Property (the "**Equitable Lien**") in the amount of the balance due under the Senior Note secured by the Senior Mortgage as modified by the Loan Documents.

151.    To the extent the Special Proceeding does not cancel and expunge the Illegitimate Documents, including the Illegitimate Mortgage Discharge, there still exists an Equitable Lien on the Mortgaged Property because the Illegitimate Mortgage Discharge was inadvertently filed.

152.    Lender is entitled to foreclose upon the Equitable Lien for the reasons stated in the First Cause of Action.

153.    Borrower's inability or unwillingness to pay the required sums required under the Loan Documents constitutes grounds for foreclosure of the Mortgaged Property under the Loan Documents, and the Equitable Lien.

154.    Upon information and belief, no party has detrimentally relied on the Illegitimate Documents.

155.    Accordingly, Lender demands Judgment that Lender is the holder of an Equitable Lien on the Mortgaged Property, and that Borrower, Guarantors, and the other defendants, and any and all persons claiming under said defendants, subsequent to the commencement of this action and filing of the notice of pendency thereof, be forever barred and foreclosed of and from all estate, right, claim, lien and equity of redemption of, in and to the said Mortgaged Property, and each and every part thereof, including any personal property appurtenant thereto, and that the Mortgaged Property be sold according to law; that the money arising from the sale be brought into Court; that the Lender be paid the amount under the Equitable Lien and the Loan Documents, including the Senior Mortgage, Junior Mortgage, Senior Note and Junior Note, with the accrued interest and late charges thereon to the time of such payment, in accordance with the Loan Documents, together with its reasonable attorneys' fees, court costs, other expenses and disbursements of this action, and the expenses of said sale.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Foreclosure of Junior Mortgage)

156.    Lender repeats and realleges the allegations contained in paragraphs 1 through 155 as though fully set forth herein.

157.    Lender is the owner and holder of the Loan Documents, including the Junior Mortgage, and is authorized to commence a foreclosure action pursuant to the Loan Documents.

158.    Borrower's inability or unwillingness to pay the required sums required under the Loan Documents constitutes grounds for foreclosure of the Mortgaged Property under the Loan Documents, including the Junior Mortgage.

159.    Accordingly, Lender demands Judgment that Borrower, Guarantors, and the other defendants, and any and all persons claiming under said defendants, subsequent to the commencement of this action and filing of the notice of pendency thereof, be forever barred and foreclosed of and from all estate, right, claim, lien and equity of redemption of, in and to the said Mortgaged Property, and each and every part thereof, including any personal property appurtenant thereto, and that the Mortgaged Property be sold according to law; that the money arising from the sale be brought into Court; that the Lender be paid the amount under the Loan Documents, including the Senior Mortgage, Junior Mortgage, Senior Note and Junior Note, with the accrued interest and late charges thereon to the time of such payment, in accordance with the Loan Documents, together with its reasonable attorneys' fees, court costs, other expenses and disbursements of this action, and the expenses of said sale.

### AS AND FOR A FOURTH CAUSE OF ACTION
**(Deficiency Judgment for Senior Loan Documents Against Borrower and Guarantors)**

160.    Lender repeats and realleges the allegations contained in paragraphs 1 through 159 as though fully set forth herein.

161.    By virtue of the Loan Documents, including the Senior Note, Senior Mortgage, Senior Guaranty, and Amended Guaranty, Borrower and Guarantors obligations under the Loan Documents are fully recourse to the Borrower and Guarantors, and Borrower and Guarantors are personally liable to pay Lender for any deficiency which may remain after applying all of said sales proceeds, together with interest thereon and other charges, in accordance with the Loan Documents.

35

162.    Such indebtedness will continue to accrue and, therefore, the precise amount due from Borrower and Guarantors to Lender through the date of Judgment herein should be determined by the Court.

## AS AND FOR A FIFTH CAUSE OF ACTION
### (Deficiency Judgment for Junior Loan Documents Against Borrower and Guarantors)

163.    Lender repeats and realleges the allegations contained in paragraphs 1 through 162 as though fully set forth herein.

164.    Pursuant to the Loan Documents, including the Junior Guaranty, Guarantors are liable for so-called "bad boy acts."

165.    Specifically, and per Exhibit A to the Junior Guaranty, Guarantors may be personally liable for any Loss under the Junior Mortgage arising out of or in connection with certain defined "bad boy acts," including, *inter alia*:

> (vi) the misapplication, misappropriation or conversion by any Borrower Party of . . . (C) any rents during the continuance of an Event of Default, . . . (xi) any unauthorized entering into, modification, settlement or termination of any Lease at the Property in violation of any of the Existing Loan Documents; . . . (xiii) Borrower's failure after and during the continuation of an Event of Default to deliver on demand by Lender all rents and records (in Borrower's possession) relating to the Property and any act or omission by the Borrower or any Guarantor or any of their affiliates which hinders, delays or interferes with Lender's enforcement of the lockbox established by the Restricted Account Agreement . . . executed and delivered in connection with the Existing Loan; . . . .

166.    Furthermore, Guarantors may be personally liable for the full amount of the Debt in the event that Borrower engages in:

> (ii) fraud or intentional misrepresentation by any Borrower Party in connection with the Loan, (iii) any act or omission of any of Borrower or any Guarantor or affiliate of any thereof which hinders, delays or interferes with Lender's enforcement of its rights hereunder or under any other Loan Document or the realization of the collateral, including the assertion by any of Borrower or any Guarantor of defenses or counterclaims unless Borrower or any

36

> Guarantor, as the case may be, is the prevailing party in the action in which such defense or counterclaim is asserted . . . .

167.   Upon information and belief, Borrower has engaged in so-called "bad boy acts" under paragraph (a) of the definition of Guaranteed Recourse Obligations, Borrower and Guarantors have engaged in activities that subject the Guarantors to personal liability for the full amount of the Debt pursuant to paragraph (b) of the definition of Guaranteed Recourse Obligations, or both.

168.   Accordingly, Borrower and Guarantors are personally liable to pay Lender for any deficiency under the Junior Mortgage which may remain after applying all of said sales proceeds, together with interest thereon and other charges, in accordance with the Loan Documents.

169.   Such indebtedness will continue to accrue and, therefore, the precise amount due from Borrower and Guarantors to Lender through the date of Judgment herein should be determined by the Court.

## AS AND FOR A SIXTH CAUSE OF ACTION
### (Appointment of Receiver)

170.   Lender repeats and realleges the allegations contained in paragraphs 1 through 169 as though fully set forth herein.

171.   Among Lender's rights and remedies upon the occurrence of an Event of Default is to have a receiver appointed, without notice and without regard for the adequacy of the security of the Senior Mortgage.

172.   The Loan Documents expressly allow Lender to seek, and indicate Borrower's express consent to, the appointment of a receiver upon the occurrence of an Event of Default.

173.   Section 8.1(g) of the Senior Mortgage provides that upon the occurrence and during the continuance of any Event of Default, Lender may "seek and obtain the appointment of a receiver, trustee, liquidator or conservator of the Property, without notice and without regard for

37

the adequacy of the security for the Debt and without regard for the solvency of Borrower, any guarantor or indemnitor under the Loan or any other Person liable for the payment of the Debt."

174. As noted above, Section 3.1 of the ALR explains that, upon an Event of Default, Lender is "immediately [] entitled to possession of all Rents and sums due under any Lease Guaranties, whether or not Lender enters upon or takes control of the Property." In other words, any Rent collected from the Property since the Event of Default must be provided to the Lender.

175. The Lender may thereupon "enter into or upon the Property, either personally or by its agents, nominees or attorneys and dispossess Borrower and its agents and servants therefrom . . . and take possession of all books, records and accounts relating thereto and Borrower agrees to surrender possession of the Property and of such books, records and accounts to Lender upon demand."

176. For the avoidance of doubt, the Illegitimate Documents are void and were void at their inception because Huntington had no authority to file the Illegitimate Documents, no interest in the Senior Mortgage or ALR when filed, and Huntington acknowledges the Illegitimate Documents were filed in error.

177. Likewise, Section 5 of the Junior Mortgage provides that "the holder of this mortgage, in any action to foreclose it, shall be entitled to the appointment of a receiver."

178. The Leases, the Rents, the books, records, and other property relating to the ownership and operation of the Mortgaged Property (the "**Borrower's Assets**") are the sole assets of Borrower.

179. Borrower and its agents are still in possession of Borrower's Assets.

180. Lender, as an interested and secured party, is potentially threatened with material losses and injuries, including the Borrower's Assets suffering continuous waste and a dissipation or diminution in value, if Borrower remains in control of Borrower's Assets.

181. Therefore, in accordance with the Loan Documents, Lender, as a secured creditor, asks the Court to appoint a receiver to take immediate possession of and hold, subject to the discretion of this Court, the Mortgaged Property and Borrower's Assets.

### AS AND FOR A SEVENTH CAUSE OF ACTION
### (Recovery of Amounts Advanced During Pendency of Action)

182. Lender repeats and realleges the allegations contained in paragraphs 1 through 181 as though fully set forth herein.

183. Upon information and belief, Lender will be compelled during the pendency of this action to pay taxes, assessments, water charges, sewer charges, insurance premiums and other charges affecting the Mortgaged Property. Lender requests that any sums paid by Lender be added to the sum otherwise due and be deemed secured by the Mortgaged Property as a valid lien against the Mortgaged Property, together with interest thereon.

184. By virtue of the foregoing, a sum is and will be due from Borrower to Lender in an amount to be determined by the Court, together with interest due thereon from the various due dates.

### AS AND FOR AN EIGHTH CAUSE OF ACTION
### (Recovery of Attorneys' Fees)

185. Lender repeats and realleges the allegations contained in paragraphs 1 through 184 as though fully set forth herein.

186. Pursuant to the terms of the Loan Documents, Lender is entitled to recover from Borrower its reasonable attorneys' fees, costs and expenses incurred in connection with this action. Specifically, Section 8.3 of the Senior Mortgage provides that, in the event Lender commences a

foreclosure action, "the costs and expense thereof (including reasonable attorneys' fees to the extent permitted by law), with interest as provided in this Section 8.3, shall constitute a portion of the Debt and shall be due and payable to Lender upon demand."

187.    Lender has incurred costs, expenses, and reasonable attorneys' fees in connection with this action, in a sum not yet ascertainable, but which will, upon information and belief, exceed the sum of $100,000.

188.    By reason of the foregoing, there is due and owing to Lender an additional sum in an amount to be determined by the Court, for costs, expenses and reasonable attorneys' fees incurred in connection with this action in a sum not yet ascertainable, but which will, upon information and belief, exceed the sum of $100,000.00.

**WHEREFORE**, Lender demands judgment as follows:

A.    On its First Cause of Action against Borrower, Guarantors, and all other defendants, that it be adjudged that Lender has a valid senior lien against the Mortgaged Property in an amount which reflects all unpaid principal and interest and other charges due through the date of the judgment of foreclosure and sale in this action; that Plaintiff be decreed the owner of the Mortgaged Property and all personal property in connection with the Mortgaged Property; that Borrower, Guarantors, and the other defendants, and all other persons claiming under them or any of them subsequent to the commencement of this action and the filing of the Notice of Pendency, be barred and forever foreclosed of and from all estate, right, title, claim, lien and equity of redemption of, in and to the Mortgaged Property, and each and every part thereof, including the fixtures and articles of personalty, upon which said Senior Mortgage is a lien, attached to or used in connection with said Mortgaged Property; that said Mortgaged Property be decreed to be sold in one parcel, according to law, in "as is" physical order and condition, together with the fixtures

40

and articles of personalty upon which said Senior Mortgage is a lien or which are otherwise attached to or used in connection with said Mortgaged Property, but subject to (i) any state of facts that an inspection of the Mortgaged Property would disclose; (ii) any state of facts that an accurate survey of the Mortgaged Property would show; (iii) covenants, restrictions, easements and public utility agreements of record which are superior to the Senior Mortgage, if any; (iv) building and zooming ordinances and possible violations of same; (v) any equity of redemption of the United States of America to redeem the premises within 120 days from the date of sale; and (vi) prior lien(s) of record, if any, including any prior mortgage lien, any mechanics liens that the monies arising from the sale be brought into Court and that the Lender be paid the amount due on said Loan Documents, together with interest and late charges to the time of such payment, plus reasonable attorneys' fees, and the costs of this action and the expenses of said sale so far as the amount of such monies properly applicable thereto will pay the same;

B.      On its First Cause of Action, and to the extent that the Special Proceeding has not resulted in the expungement of the Illegitimate Documents, including the Illegitimate Mortgage Discharge, Lender seeks an order expunging the Illegitimate Documents;

C.      On its Second Cause of Action, and in the alternative, against Borrower, Guarantors, and all other defendants, that it be adjudged that Lender has a valid Equitable Lien on the Mortgaged Property in an amount which reflects all unpaid principal and interest and other charges due through the date of the judgment of foreclosure and sale in this action under the Senior Mortgage; that Plaintiff be decreed the owner of the Mortgaged Property and all personal property in connection with the Mortgaged Property; that Borrower, Guarantors, and the other defendants, and all other persons claiming under them or any of them subsequent to the commencement of this action and the filing of the Notice of Pendency, be barred and forever foreclosed of and from all

41

estate, right, title, claim, lien and equity of redemption of, in and to the Mortgaged Property, and each and every part thereof, including the fixtures and articles of personalty, upon which said Senior Mortgage is a lien, attached to or used in connection with said Mortgaged Property; that said Mortgaged Property be decreed to be sold in one parcel, according to law, in "as is" physical order and condition, together with the fixtures and articles of personalty upon which said Senior Mortgage is a lien or which are otherwise attached to or used in connection with said Mortgaged Property, but subject to (i) any state of facts that an inspection of the Mortgaged Property would disclose; (ii) any state of facts that an accurate survey of the Mortgaged Property would show; (iii) covenants, restrictions, easements and public utility agreements of record which are superior to the Senior Mortgage and Junior Mortgage, if any; (iv) building and zooming ordinances and possible violations of same; (v) any equity of redemption of the United States of America to redeem the premises within 120 days from the date of sale; and (vi) prior lien(s) of record, if any, including any prior mortgage lien, any mechanics liens that the monies arising from the sale be brought into Court and that the Lender be paid the amount due on said Loan Documents, together with interest and late charges to the time of such payment, plus reasonable attorneys' fees, and the costs of this action and the expenses of said sale so far as the amount of such monies properly applicable thereto will pay the same;

D.    On its Third Cause of Action against Borrower, Guarantors, and all other defendants, that it be adjudged that Lender has a valid junior lien against the Mortgaged Property in an amount which reflects all unpaid principal and interest and other charges due through the date of the judgment of foreclosure and sale in this action; that Plaintiff be decreed the owner of the Mortgaged Property and all personal property in connection with the Mortgaged Property; that Borrower, Guarantors, and the other defendants, and all other persons claiming under them or any

42

of them subsequent to the commencement of this action and the filing of the Notice of Pendency, be barred and forever foreclosed of and from all estate, right, title, claim, lien and equity of redemption of, in and to the Mortgaged Property, and each and every part thereof, including the fixtures and articles of personalty, upon which said Junior Mortgage is a lien, attached to or used in connection with said Mortgaged Property; that said Mortgaged Property be decreed to be sold in one parcel, according to law, in "as is" physical order and condition, together with the fixtures and articles of personalty upon which said Junior Mortgage is a lien or which are otherwise attached to or used in connection with said Mortgaged Property, but subject to (i) any state of facts that an inspection of the Mortgaged Property would disclose; (ii) any state of facts that an accurate survey of the Mortgaged Property would show; (iii) covenants, restrictions, easements and public utility agreements of record which are superior to the Junior Mortgage, if any; (iv) building and zooming ordinances and possible violations of same; (v) any equity of redemption of the United States of America to redeem the premises within 120 days from the date of sale; and (vi) prior lien(s) of record, if any, including any prior mortgage lien, any mechanics liens that the monies arising from the sale be brought into Court and that the Lender be paid the amount due on said Loan Documents, together with interest and late charges to the time of such payment, plus reasonable attorneys' fees, and the costs of this action and the expenses of said sale so far as the amount of such monies properly applicable thereto will pay the same;

E.      On its Fourth Cause of Action against Borrower and Guarantors, that in the event the proceeds from such sale be insufficient to pay to Lender the entire amount due pursuant to the Senior Mortgage as described above, then Lender shall have a judgment against Borrower and Guarantors for the amount of any such deficiency;

F.    On its Fifth Cause of Action against Borrower and Guarantors, that in the event the proceeds from such sale be insufficient to pay to Lender the entire amount due pursuant to the Junior Mortgage as described above, then Lender shall have a judgment against Guarantors for the amount of any such deficiency;

G.    On its Sixth Cause of Action against Borrower, the appointment of a receiver, trustee, liquidator or conservator of the Mortgaged Property during the pendency of the instant action;

H.    On its Sixth Cause of Action against Borrower, and to the extent that the Special Proceeding has not resulted in the expungement of the Illegitimate Documents, including the Illegitimate ALR Satisfaction, Lender seeks an order expunging the Illegitimate Documents;

I.    On its Seventh Cause of Action against Borrower and Guarantors, in an amount to be determined by the Court;

J.    On its Eighth Cause of Action against Borrower and Guarantors, in an amount to be determined by the Court, but which amount is believed to exceed the sum of $100,000.00, together with costs allowances and disbursements of this action;

K.    That Lender have such other and further relief as the Court deems just and proper.

Dated: January 24, 2022
New York, New York

Respectfully submitted,
**DLA PIPER LLP (US)**

_____

Neal Kronley
John O. Wray
Michael D. Manzo
1251 Avenue of the Americas
New York, NY 10020
(212) 335-4500
Neal.Kronley@us.dlapiper.com
John.Wray@us.dlapiper.com
Michael.Manzo@us.dlapiper.com

*Counsel for Plaintiff*
*IMC Lending, LLC*

## SCHEDULE A

The Mortgaged Property is that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Borough of Brooklyn, County of Kings, City and State of New York, bounded and described as follows:

a. BEGINNING at the corner formed by the intersection of the northerly side of Avenue J with the easterly side of East 13th Street;

b. RUNNING THENCE northerly along the easterly side of East 13th Street, 180 feet;

c. THENCE easterly parallel with Avenue J, 100 feet;

d. THENCE southerly parallel with East 13th Street, 180 feet to the northerly side of Avenue J; THENCE westerly along the northerly side of Avenue J, 100 feet to the corner, the point or place of BEGINNING.

## END OF SCHEDULE A